" * * * Did this negro, Lee Walker, shoot up the same hall on the 19th day of June there in Ludington?"

The hall referred to was the poolhall in which the deceased met his death at the hands of the accused. The homicide took place, as charged in the bill of indictment, on September 15, 1923; whereas, the interrogatory addressed to the witness concerned an entirely different transaction occurring some three months prior thereto.

The purpose of propounding the question is not set forth in the bill of exception. The only possible purpose, however, counsel for defendant could have had in mind, was to establish by the testimony sought to be elicited that the deceased was a dangerous man, and to impugn his character for peace and quietness.

The evidence was properly excluded. Testimony of a specific act of violence cannot be admitted as tending to show that the victim of a homicide was of a turbulent and vicious disposition, and to impugn his character for peace and quietness. In that respect, the evidence must be confined to his general reputation.

[3] The testimony was inadmissible on the further ground, as shown in the judge's per curiam, that, under his plea of self-defense, defendant had failed to lay the proper foundation for the admission of such testimony, by first showing a hostile demonstration or an overt act on the part of the deceased. On this branch of the case the trial judge shows that the testimony established, beyond any reasonable doubt, that the deceased was shot while he was standing, with his hands in his pockets, watching a pool game; that the defendant without warning dropped a tobacco box on the floor, stooped to pick it up, and came up shooting; that the deceased was shot twice in the right side, the bullets coming out through the left side.

Bill No. 3 was reserved to the refusal of the judge to grant a motion for a new trial. The grounds urged in the motion are the same relied upon in Bills Nos. 1 and 2, and have been disposed of unfavorably to defendant's contentions in our consideration and decision of the points raised under said bills.

Judgment affirmed.

O'NIELL, C. J., dissents.

══════

(98 South. 739)

No. 25962.

STURDEVANT v. WINN et al.

(Jan. 7, 1924.)

*(Syllabus by Editorial Staff.)*

1. Drains ⬤⟳17—Drainage commissioners held not authorized to fill vacancies in board.

Since, under Act No. 317 of 1910, § 3, the police jury had authority to appoint three of five drainage commissioners and to fill vacancies accordingly, and the Governor had authority to appoint the two others and to fill vacancies, when three of five commissioners became disqualified the two remaining commissioners had no authority to fill such vacancies.

2. Drains ⬤⟳18—Drainage commissioners held authorized to remove obstruction of drain.

Since Act No. 317 of 1910, § 6, as amended by Act No. 227 of 1914, § 3; invests drainage district commissioners with authority to open such natural drains as the board may deem necessary and do all work in connection therewith, it was not an abuse of the board's authority to remove an obstruction placed across

a drain under the purported authority of drainage commissioners illegally appointed.

Appeal from Fifteenth Judicial District Court, Parish of Jefferson Davis; Jerry Cline, Judge.

Action by Joseph Sturdevant against Hezekiah Winn and others. Judgment for defendants, and plaintiff appeals. Affirmed.

Smith & Carmouche, of Crowley, for appellant.

Griffin T. Hawkins, Dist. Atty., and McCoy & Moss, all of Lake Charles, for appellees.

By Division A, composed of O'NIELL, C. J., and ROGERS and BRUNOT, JJ.

O'NIELL, C. J. This is an appeal from a judgment dissolving a writ of injunction after trial of the case on its merits. The defendants are the president and members of the board of commissioners of the Keystone drainage district No. 1. Plaintiff owns a plantation known as the Keystone plantation. In 1913, he made a contract with the board of commissioners of the drainage district, granting to the board the right to cut a drainage canal across his irrigation canal, on condition that the board would construct and maintain, at the board's expense, a flume for the passage of the water in plaintiff's irrigation canal across or under the drainage canal. The canal was cut and the flume constructed and maintained for about nine years. Then, for some unexplained reason, plaintiff desired to do away with the flume and to put in a double dam across the drainage canal. He obtained permission to do so from four persons acting as commissioners of the drainage district, two of whom were not legally appointed commissioners. The facts in that respect are as follows: Three of the five commissioners of the district sold their property and moved out of the district. The two remaining commissioners, J. C. Gibson and A. A. Gautier, without legal authority, named three new commissioners, Felix Bonin, Joseph Langley and Camile Broussard, to succeed the commissioners who had become disqualified. Thereafter, the r̄ice jury appointed, to fill the three vacancies, J. C. Gibson, Hezekiah Winn and Alfred Artego. The two other commissioners, A. A. Lyons and T. H. Winn, were appointed by the Governor. The meeting at which plaintiff afterwards undertook to obtain authority to abolish the flume and to dam the drainage canal was composed of Gautier, Gibson, Bonin and Langley. The two last-named men told plaintiff, when he requested them to attend the meeting, that they were not members of the board.

[1] According to section 3 of Act 317 of 1910, p. 544, the police jury had the authority to appoint three of the five commissioners, and to fill vacancies accordingly, and the Governor had the authority to appoint the two other commissioners, and to fill vacancies accordingly. Therefore, when three of the five commissioners of the Keystone Drainage District No. 1 had moved away or become disqualified, the remaining two commissioners had no authority to fill the vacancies.

Acting on the supposed authority granted by Messrs. Gautier, Gibson, Bonin and Langley, plaintiff constructed a dam across the drainage canal, stopping the drainage completely. The board of commissioners, as then legally constituted, met and adopted a resolution demanding that the dam be removed. On plaintiff's refusal to remove the dam, the board met again and employed men to demolish the dam. When they undertook to demolish the dam, plaintiff's employees, armed with shotguns, drove them away. Thereupon the board of commissioners met again and adopted a resolution authorizing the institution of an injunction suit to prevent plaintiff's interference with the removal of the dam. The injunction suit was filed, and, immediately thereafter, plaintiff brought this counter injunction suit, preventing a removal of the dam.

[2] The boards of commissioners of drainage districts are political corporations, and have all of the authority and prerogatives of other such corporations. Section 6 of Act 317 of 1910, as amended by Act 227 of 1914, p. 424. Among the powers granted to boards of commissioners of drainage districts, by section 8 of the statute as amended, is the authority to open such natural drains as the board may deem necessary, to do all such work in connection therewith as the board may deem necessary to make the opening of such natural drains effective, and to cut and open new drains or canals wherever deemed necessary. There was no abuse of the board's authority in this case. The writ of injunction should not have been issued.

The judgment is affirmed at appellant's cost.